**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE XPO LOGISTICS, INC. DERIVATIVE LITIGATION | Case No. 19-cv-889-RGA |
| | **DEMAND FOR JURY TRIAL** |

## VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Adriana Jez ("Plaintiff Jez") and Plaintiff Erin Candler ("Plaintiff Candler," and together with Plaintiff Jez, "Plaintiffs") by their undersigned attorneys, derivatively and on behalf of Nominal Defendant XPO Logistics, Inc. ("XPO" or the "Company"), file this Verified Consolidated Shareholder Derivative Complaint against Individual Defendants Bradley S. Jacobs, John J. Hardig, Scott B. Malat, Gene L. Ashe, Louis DeJoy, AnnaMaria DeSalva, Michael G. Jesselson, Adrian P. Kingshott, Jason D. Papastavrou, and Oren G. Shaffer (collectively, the "Individual Defendants," and together with XPO, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of XPO, unjust enrichment, waste of corporate assets, and violation of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiffs' complaint against the Individual Defendants, the Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding XPO, legal filings, news reports, securities analysts' reports and advisories about the Company,

and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by XPO's directors and officers from at least August 3, 2016 through the present (the "Relevant Period").

2.      XPO purports to be a top ten global provider of transportation and logistics services that provides "cutting-edge supply chain solutions to the most successful companies in the world." XPO operates globally through a network of people, technology, and physical assets. The Company has two reportable segments, Transportation and Logistics. Most of the Company's revenue is derived from its Transportation segment, which accounted for 65% of the Company's overall revenue in 2018. The Company touts itself as being "asset-light, with the revenue generated by activities directly associated with our owned assets accounting for less than a third of our revenue in 2018."

3.      For much of its existence prior to 2016, XPO operated at a net loss, and was unable to grow its business. However, by way of an acquisition in August 2016, XPO came into a business relationship with Amazon.com, Inc. ("Amazon"), the world's largest e-commerce marketplace.

4.      From August 2016 through 2018, XPO was profitable for the first time. During this period, Amazon was the Company's largest customer, and contributed significantly to the Company's growth and profits. The key to XPO's success, however, was kept behind closed doors.

5.      Although the Individual Defendants disclosed certain information regarding the Company's "largest customer," they did not reveal the identity of this customer to the public, nor did they reveal the extent of the Company's dependence on its relationship with its largest

customer to maintain the newfound growth and financial success the Company was experiencing. Moreover, Amazon had communicated to the Company at the beginning of their business relationship that the relationship was not to continue for the long term. Yet, throughout the Relevant Period, the Company represented that its recent growth was sustainable and the result of "a diversified customer base that minimize[d] concentration risk." Despite their awareness that XPO's lucrative arrangement with Amazon would not last, the Defendants falsely represented to the investing public that they were unaware of any "unsustainable" business conditions affecting the Company's new profitability.

6.      During April 2018, shortly after XPO hired away one of Amazon's executives and announced a new service that would directly compete with one of Amazon's core services, Amazon began the process of winding down its business relationship with the Company.

7.      Over the summer of 2018, Amazon gradually pulled its business from distribution centers operated by XPO. Amazon's winding down impacted both XPO's Transportation and Logistics segments, and as a result XPO began suffering declines in its overall business, laying off large numbers of employees and closing several of its warehouses.

8.      In each of the Company's SEC filings, press releases, investor conferences, and other public statements issued during the Relevant Period, the Individual Defendants attempted to conceal from the public the true extent of the Company's reliance on its business relationship with Amazon, and the harm to the Company that would result from Amazon's winding down of that relationship. The Individual Defendants continued to conceal these facts even after it had become clear that the Company's growth was stagnating, going so far as to categorize the Company's lower shipping volumes as a strategic endeavor aimed at improving the Company's business. The reality, however, was starkly different. The Individual Defendants attempted in vain to shield the public

from witnessing the impact Amazon had on XPO's business operations as they struggled to replace their largest customer. The Company was unable to meet Amazon's withdrawal effectively.

9.     During this time, after it had become clear that Amazon was acting on its plans to end its relationship with the Company, Defendant Jacobs attempted to conceal the effects that Amazon's winding down would have on the Company's financial statements. To illustrate, during a November 1, 2018 conference call, Defendant Jacobs blamed the Company's disappointing performance for the fiscal quarter ended September 30, 2018 on a customer's "rounding error." During this same period, Defendant Jacobs also attempted to negotiate a merger with a similarly sized Company, which would have allowed the Company to file consolidated financial statements, thus obscuring the impact of the Company's loss of Amazon's business.

10.    Events came to a head on December 11, 2018, when an XPO executive revealed nonpublic information relating to the Company's loss of Amazon's business at a private lunch with investors.

11.    As a result, the Company was forced to disclose publicly on December 12, 2018 that (i) the Company would have to accelerate the use of practically all of its available $188 million in tax benefits in order to reach its 2018 free cash flow guidance of $625 million; (ii) the Company would be revising its 2019 free cash flow guidance; and (iii) the Company would be revising its "base-case" growth assumptions to 12%–15% growth, down from 15%–18% growth.

12.    Upon this news, XPO's share price dropped from $66.69 at the close of trading on December 11, 2018 to $44.50 at the close of trading on December 13, 2018. This also caused the merger negotiations Defendant Jacobs was engaged in to fall apart.

13.    The Company's growth and financial state continued to decline through February 15, 2019, when at a conference call held to discuss the Company's financial statements, Defendant

Jacobs at last revealed that the dissolution of the Company's business relationship with its "largest customer" was having a material negative impact on XPO's growth. As confirmed by XPO's employees, this customer's identity was Amazon.

14.     During the February 15, 2019 conference call, Defendant Jacobs further revealed that the Company knew that its business with Amazon "wasn't going to stay forever."

15.     Upon this disclosure, XPO's share price dropped from $59.55 at the close of trading on February 14, 2019 to $51.97 at the close of trading on February 15, 2019.

16.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) a significant amount of the Company's growth was due to its business relationship with Amazon, the Company's largest customer; (2) as a result of its dependence on this relationship, the Company was not as well diversified as it purported to be; (3) Amazon had made clear to the Company that the Company's business relationship with Amazon was only going to be temporary; (4) the dissolution of the Company's business relationship with Amazon would have a significantly negative effect on the Company's growth and financial condition; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

17.     The Individual Defendants also breached their fiduciary duties by failing to correct and causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

18.    Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. From December 1, 2018 through December 31, 2018, 10 million shares of the Company's common stock were repurchased for approximately $536 million. Between January 1, 2019 and February 14, 2019,[1] 8 million shares of the Company's common stock were repurchased for approximately $464 million. As the Company stock was actually only worth $51.97 per share, the price at which it was trading at the close of business on February 15, 2019, the Company overpaid approximately $64.5 million in total.

19.    In light of the Individual Defendants' misconduct, which has subjected XPO, its Chairman and Chief Executive Officer ("CEO"), its former Chief Financial Officer ("CFO"), and its former Chief Strategy Officer ("CSO") to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the District of Connecticut (the "Securities Class Action"),[2] and has subjected XPO to the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

20.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Company's CEO's,

---

[1] These repurchases were disclosed on the Company's annual report filed on February 14, 2019 on Form 10-K with the SEC for the fiscal year ended December 31, 2018.
[2] Referring to the Amended Consolidated Class Action Complaint filed on June 3, 2019.

former CFO's, and former CSO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of XPO's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

22.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

26.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District,

and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

27.     Venue is proper in this District because XPO and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiffs

28.     Plaintiff Jez is a current shareholder of XPO common stock and has continuously held XPO common stock at all relevant times.

29.     Plaintiff Candler is a current shareholder of XPO common stock and has continuously held XPO common stock at all relevant times.

### Nominal Defendant XPO

30.     XPO is a Delaware corporation with its principal executive offices at Five American Lane, Greenwich, CT, 06831. XPO's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "XPO."

### Defendant Jacobs

31.     Defendant Jacobs has served as the Company's CEO and as Chairman of the Board since September 2011 when he acquired the Company for over $150 million through Jacobs Private Equity, Inc. ("JPE"), the Company's largest stockholder. He is also the managing member of JPE and therefore a controlling shareholder of the Company. According to the Company's Schedule 14A filed with the SEC on April 22, 2019 (the "2019 Proxy Statement"), as of April 12, 2019, Defendant Jacobs beneficially owned  19,799, 601 shares of the Company's common stock, which represented 17.7% of the Company's outstanding shares of common stock on that date and

94.9% of the Company's Series A Preferred Stock.[3] Given that the price per share of the Company's common stock at the close of trading on April 12, 2019 was $63.19, Defendant Jacobs owned over $1.2 billion worth of XPO stock.  According to the Company's annual report filed on February 14, 2019 on a Form 10-K with the SEC for the fiscal year ended December 31, 2018 (the "2018 10-K"),  Defendant Jacobs "controls a large portion of [Company] stock and has substantial control over [the Company], which could limit other stockholders' ability to influence the outcome of key transactions, including changes of control."

32.     The 2018 10-K further outlined in relevant part:

Under applicable SEC rules, our Chairman and Chief Executive Officer, Mr. Bradley S. Jacobs, beneficially owns approximately 15% of our outstanding common stock as of December 31, 2018. This concentration of share ownership may adversely affect the trading price for our common stock because investors may perceive disadvantages in owning stock in companies with concentrated stockholders. Our preferred stock votes together with our common stock on an "as-converted" basis on all matters, except as otherwise required by law, and separately as a class with respect to certain matters implicating the rights of holders of shares of the preferred stock. ***Accordingly, Mr. Jacobs can exert substantial influence over our management and affairs and matters requiring stockholder approval, including the election of directors and the approval of significant corporate transactions, such as mergers, consolidations or the sale of substantially all of our assets. Consequently, this concentration of ownership may have the effect of delaying or preventing a change of control, including a merger, consolidation, or other business combination involving us, or discouraging a potential acquirer from making a tender offer or otherwise attempting to obtain control, even if that change of control would benefit our other stockholders.*** Additionally, significant fluctuations in the levels of ownership of our largest stockholders, including shares beneficially owned by Mr. Jacobs, could impact the volume of trading, liquidity and market price of our common stock.

(Emphasis added.)

---

[3] These shares included the shares owned indirectly by Defendant Jacobs as the managing member of JPE and 263,887 shares of common stock held directly by Defendant Jacobs.

33.    For the fiscal year ended December 31, 2018, Defendant Jacobs received $13,327,471 in compensation from the Company. This included $625,000 in salary, $12,690,463 in stock awards, and $12,008 in all other compensation.

34.    The Company's 2019 Proxy Statement stated the following about Defendant Jacobs:

> Mr. Jacobs has served as our chief executive officer and chairman of our Board of Directors since September 2, 2011. Mr. Jacobs is also the managing member of JPE, which is our second largest stockholder. Prior to XPO, he led two public companies: United Rentals, Inc. (NYSE: URI), which he founded in 1997, and United Waste Systems, Inc., which he founded in 1989. Mr. Jacobs served as chairman and chief executive officer of United Rentals for that company's first six years, and as its executive chairman for an additional four years. He served eight years as chairman and chief executive officer of United Waste Systems.
>
> **Board Committees:**[4] None
> **Other Public Company Boards:**  None
>
> ***Mr. Jacobs brings to the Board:***
>
> ■ In-depth knowledge of the company's business resulting from his years of service with the company as its chief executive officer;
>
> ■ Leadership experience as the company's chairman and chief executive officer, and a successful track record of leading companies that execute strategies similar to ours; and
>
> ■ Extensive past experience as the chairman of the board of directors of several public companies.

**Defendant Hardig**

35.    Defendant John J. Hardig ("Hardig") served as XPO's CFO from February 2012 until he stepped down from his position in August 2018. According to the 2019 Proxy Statement, as of February 21, 2018, Defendant Hardig beneficially owned 115,598 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of

---

[4] Emphasis in original unless otherwise noted in this Complaint.

trading on February 21, 2018 was $93.99, Defendant Hardig owned approximately $10.8 million worth of XPO stock.

36.    For the fiscal year ended December 31, 2018, Defendant Hardig received $359,688 in compensation from the Company. This included $324,846 in salary and $34,842 in all other compensation.

### Defendant Malat

37.    Defendant Scott B. Malat ("Malat") served as XPO's CSO from July 2012 until he stepped down from his position in December 2018. According to the Company's Schedule 14A filed with the SEC on April 18, 2018 (the "2018 Proxy Statement"), as of April 6, 2018, Defendant Malat beneficially owned 171,525 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 21, 2018 was $96.23, Defendant Malat owned approximately $16,505,850 million worth of XPO stock.

38.    For the fiscal year ended December 31, 2017, Defendant Malat received $1,084,021 in compensation from the Company. This included $500,000 in salary, $575,000 in non-equity incentive plan compensation, and $9,021 in all other compensation.

### Defendant Ashe

39.    Defendant Gene L. Ashe ("Ashe") has served as a Company director since March 2016 and also serves as a member of the Audit Committee and the Acquisition Committee. Defendant Ashe has also served as vice-chairman of XPO Logistics Europe S.A., a majority owned subsidiary of the Company. According to the 2019 Proxy Statement, as of April 12, 2019, Defendant Ashe beneficially owned 8,757 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2019 was $63.19, Defendant Ashe owned approximately $553,354 worth of XPO stock.

40.     For the fiscal year ended December 31, 2018, Defendant Ashe received $272,192 in compensation from the Company. This included $80,645 in fees earned or cash paid and $191,546 in stock awards. Defendant Ashe also received €65,000 in fees for her service as vice-chairman of the Supervisory Board of XPO Logistics, S.A.

41.     The Company's 2018 Proxy Statement stated the following about Defendant Ashe:

Ms. Ashe has served as a director of the company since March 21, 2016. Ms. Ashe has served as the president and chief executive officer of GLA Legal Advisory Group, LLC since February 2018. Also, Ms. Ashe has served as vice-chairman of the Supervisory Board of XPO Logistics Europe S.A., our majority-owned subsidiary, since February 2017. She was senior vice president, chief legal officer and corporate secretary of Adtalem Global Education Inc. (NYSE: ATGE) from May 2017 to February 2018, and executive vice president, chief legal officer, and corporate secretary of BrightView Landscapes, LLC (formerly The Brickman Group, Ltd. LLC) from December 2012 to June 2016. Earlier, she served as senior vice president of legal affairs for Catalina Marketing Corporation and held senior legal roles with the Public Broadcasting Service ("PBS"), Darden Restaurants, Inc., Lucent Technologies and AT&T. Earlier in her career, Ms. Ashe served as an electrical engineer and scientist for IBM Corporation before joining IBM's legal team. Ms. Ashe holds a juris doctorate degree from Georgetown University Law Center, where she serves on the Georgetown Law Advisory Board, a master's degree in electrical engineering from Georgia Institute of Technology and a bachelor's degree in mathematics from Spelman College, where she sits on the Board of Trustees. She has completed the executive development program at the Wharton School of the University of Pennsylvania and holds a certificate in international management from Oxford University in England.

**Board Committees:**
■ Member of Audit Committee
■ Member of Acquisition Committee

**Other Public Company Boards:**  None

*Ms. Ashe brings to the Board:*

■ More than two decades of valuable legal experience with public and private companies, which enables her to provide guidance to the Board and company management on legal matters, compliance and risk assessment and corporate governance best practices; and

■ An in-depth understanding of the dynamics of three of our most important customer verticals: e-commerce, technology and food and beverage.

**Defendant DeJoy**

42.      Defendant Louis DeJoy ("DeJoy") served as a Company director from December 2015 until May 2018. While with the Company, he served as a member of the Acquisition Committee. He also served as the CEO of the Company's supply chain business in the Americas until December 2015 and was chairman and CEO of New Breed Logistics, which the Company acquired in 2014. According to the 2018 Proxy Statement, as of April 6, 2018, Defendant DeJoy beneficially owned 1,134,686 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 6, 2018 was $96.23, Defendant DeJoy owned approximately $109.1 million worth of XPO stock.

43.      For the fiscal year ended December 31, 2017, Defendant DeJoy received $248,489 in compensation from the Company. This included $75,00 in fees earned or cash paid and $173,489 in stock awards.

44.      In addition, the Company leases office space from three entities partially owned and controlled by Defendant DeJoy. For the year ended December 31, 2018, the Company made aggregate rent payments of $1.86 million on these lease agreements.

45.      The Company's Schedule 14A filed with the SEC on April 17, 2017 (the "2017 Proxy Statement") stated the following about Defendant DeJoy:

> Mr. DeJoy has served as a director of the company since December 3, 2015. He was most recently chief executive officer of the XPO Logistics supply chain business in the Americas (retired as of December 7, 2015). Previously, he led New Breed Logistics as its chairman and chief executive officer from 1983 until XPO Logistics acquired New Breed in 2014. During that time, he grew the company from a small, regional operation to a leading U.S. provider of highly engineered, technology-driven contract logistics solutions. Mr. DeJoy is a member of the boards of trustees of Elon University and the PGA Wyndham Championship, and serves on the board of directors for The Fund for American Studies in Washington, DC.

13

He is a past member of the board of trustees of Moses Cone Health System in North Carolina, and was an appointee to the President's Commission on White House Fellowships. He holds a business degree from Stetson University.

**Board Committees**:

• Member of Acquisition Committee

**Other Public Company Boards**: None

***Mr. DeJoy brings to the Board***:

• Significant expertise in supply chain operations that allows him to provide valuable guidance to our Board on strategic and operational matters with respect to our logistics business unit.

### Defendant DeSalva

46.     Defendant AnnaMaria DeSalva ("DeSalva") has served as a Company director since September 2017, and as Vice Chairman of the Board since February 7, 2019. She also serves as the Chair of the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of April 12, 2019, Defendant DeSalva beneficially owned 2,881 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2018 was $63.19, Defendant DeSalva owned approximately $182,050 worth of XPO stock.

47.     For the fiscal year ended December 31, 2018, Defendant DeSalva received $275,000 in compensation from the Company. This included $84,354 in fees earned or cash paid and $191,546 in stock awards.

48.     The 2019 Proxy Statement stated the following about Defendant DeSalva:

Ms. DeSalva has served as a director of the company since September 19, 2017, and vice chairman of the Board since February 7, 2019. She is a senior corporate affairs advisor to leading companies. Ms. DeSalva served as chief communications officer of E.I. du Pont de Nemours & Co. (DuPont) from March 2014 to January 31, 2018 and currently serves as senior advisor to the CEO of DowDuPont. Previously, she served as vice president of corporate affairs for biopharmaceutical innovation at Pfizer; was an advisor to the U.S. Food and Drug Administration; and led the global healthcare practice of Hill & Knowlton. For Bristol-Myers Squibb, she led

global public affairs for the oncology business and served as the director of the Bristol-Myers Squibb Foundation. Ms. DeSalva serves on the board of governors of Argonne National Laboratory of the U.S. Department of Energy and is a member of its compensation and nominating committees; as well as the boards of directors of the non-profit Project Sunshine and the William & Mary Alumni Association. She is a graduate of The College of William & Mary in Williamsburg, Virginia; and has completed the Harvard School of Public Health's executive education program in risk communication, and the Advanced Health Leadership Program jointly offered by the University of California at Berkeley and Pompeu University in Barcelona, Spain.

**Board Committees:**

■ Chairman of Nominating and Corporate Governance Committee

**Other Public Company Boards:** None

***Ms. DeSalva brings to the Board:***

■ Significant experience in corporate affairs, regulatory affairs and corporate social responsibility, having previously served in senior leadership roles at several public companies; and

■ Expertise in managing significant public company merger transactions, with an emphasis on effective change management and external stakeholder engagement.

### Defendant Jesselson

49.     Defendant Michael G. Jesselson ("Jesselson") has served as a Company director since September 2011 and as lead independent director since March 2016. He also serves as a member of the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of April 12, 2019, Defendant Jesselson beneficially owned 347,764 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2019 was $63.19, Defendant Jesselson owned approximately $21.9 million worth of XPO stock.

50.    For the fiscal year ended December 31, 2018, Defendant Jesselson received $291,546 in compensation from the Company. This included $100,000 in salary and $191,546 in stock awards.

51.    The Company's 2019 Proxy Statement stated the following about Defendant Jesselson:

> Mr. Jesselson has served as director of the company since September 2, 2011, and as lead independent director since March 20, 2016. He has been president and chief executive officer of Jesselson Capital Corporation since 1994. Mr. Jesselson served as a director of American Eagle Outfitters, Inc. (NYSE: AEO) from November 1997 to May 2017, most recently as its lead independent director. Prior to that, he worked at Philipp Brothers, a division of Engelhard Industries from 1972 to 1981, then at Salomon Brothers Inc. in the financial trading sector. He is a director of C-III Capital Partners LLC, Clarity Capital and other private companies, as well as numerous philanthropic organizations. Mr. Jesselson also serves as the chairman of Bar Ilan University in Israel. He attended New York University School of Engineering.
>
> **Board Committees:**
> ■ Member of Audit Committee
> ■ Member of Compensation Committee
>
> ■ Member of Nominating and Corporate Governance Committee
>
> **Other Public Company Boards:**  None
>
> ***Mr. Jesselson brings to the Board:***
>
> ■ Significant experience with public company corporate governance issues through prior service on the board of directors of American Eagle Outfitters, including as its lead independent director; and
>
> ■ Extensive investment expertise.

## Defendant Kingshott

52.    Defendant Adrian P. Kingshott ("Kingshott") has served as a Company director since September 2011. He also serves as Chairman of the Compensation Committee and as a member of the Acquisition Committee. According to the 2019 Proxy Statement, as of April 12, 2019, Defendant Kingshott beneficially owned 134,013 shares of the Company's common stock.

16

Given that the price per share of the Company's common stock at the close of trading on April 12, 2019 was $63.19, Defendant Kingshott owned approximately $8.4 million worth of XPO stock.

53.    For the fiscal year ended December 31, 2018, Defendant Kingshott received $281,546 in compensation from the Company. This included $90,000 in salary and $191,546 in stock awards.

54.    The Company's 2019 Proxy Statement stated the following about Defendant Kingshott:

> Mr. Kingshott has served as a director of the company since September 2, 2011. He has served as the chief executive officer of AdSon, LLC since October 2005, managing director of Spotlight Advisors, LLC since September 2015 and a member of the board of directors of Centre Lane Investment Corp. since May 2011. Mr. Kingshott was a senior advisor to Headwaters Merchant Bank from 2013 until June 2018. Previously, with Goldman Sachs, he was co-head of the firm's Global Leveraged Finance business and held other positions over a 17-year tenure. More recently, Mr. Kingshott was a managing director and portfolio manager at Amaranth Advisors, LLC. He is an adjunct professor of Global Capital Markets and Investments at Fordham University's Gabelli School of Business. He holds a master's degree in business administration from Harvard Business School and a master of jurisprudence degree from Oxford University.
>
> **Board Committees:**
> ■Chairman of Compensation Committee
>
> ■Member of Acquisition Committee
>
> **Other Public Company Boards:**  None
>
> ***Mr. Kingshott brings to the Board:***
>
> ■ More than 25 years of experience in the investment banking and investment management industries; and
>
> ■ Expertise with respect to corporate governance, acquisition transactions, debt and equity financing and corporate financial management issues

**Defendant Papastavrou**

55.     Defendant Jason D. Papastavrou ("Papastavrou") has served as a Company director since September 2011. He also serves as a member of the Audit Committee, Compensation Committee, Acquisition Committee, and the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of April 12, 2019, Defendant Papastavrou beneficially owned 242,888 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2019 was $63.19, Defendant Papastavrou owned approximately $15.3 million worth of XPO stock.

56.     For the fiscal year ended December 31, 2018, Defendant Papastavrou received $281,546 in compensation from the Company. This included $90,000 in salary and $191,546 in stock awards.

57.     The Company's 2019 Proxy Statement stated the following about Defendant Papastavrou:

> Dr. Papastavrou has served as a director of the company since September 2, 2011. He founded ARIS Capital Management, LLC in 2004 and serves as its chief investment officer. Previously, Dr. Papastavrou was the founder and managing director of the Fund of Hedge Funds Strategies Group of Banc of America Capital Management (BACAP), president of BACAP Alternative Advisors, and a senior portfolio manager with Deutsche Asset Management. He was a tenured professor at Purdue University School of Industrial Engineering and holds a doctorate in electrical engineering and computer science from the Massachusetts Institute of Technology. Dr. Papastavrou serves on the board of directors of United Rentals, Inc. (NYSE: URI).
>
> **Board Committees:**
>
> ■ Chairman of Acquisition Committee
>
> ■ Member of Audit Committee
>
> ■ Member of Compensation Committee
>
> ■ Member of Nominating and Corporate Governance Committee
>
> **Other Public Company Boards:**  United Rentals, Inc. (since 2005)
>
> ***Dr. Papastavrou brings to the Board:***

■ Financial expertise related to his qualifications as an "audit committee financial expert" under SEC regulations; and

■ Extensive experience with finance and risk-related matters, from holding senior positions at investment management firms.

**Defendant Shaffer**

58.     Defendant Oren G. Shaffer ("Shaffer") has served as a Company director since September 2011. He also serves as Chairman of the Audit Committee. Defendant Shaffer has additionally served as a director for Terex Corporation since 2007.  According to the 2019 Proxy Statement, as of April 12, 2019, Defendant Shaffer beneficially owned 66,799 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2019 was $63.19, Defendant Shaffer owned approximately $4.2 million worth of XPO stock.

59.     For the fiscal year ended December 31, 2018, Defendant Shaffer received $291,546 in compensation from the Company. This included $100,000 in salary and $191, 546 in stock awards.

60.     The Company's 2019 Proxy Statement stated the following about Defendant Shaffer:

> Mr. Shaffer has served as a director of the company since September 2, 2011. From 2002 to 2007, Mr. Shaffer was vice chairman and chief financial officer of Qwest Communications International, Inc. (now CenturyLink, Inc.). Previously, Mr. Shaffer was president and chief operating officer of Sorrento Networks, Inc., executive vice president and chief financial officer of Ameritech Corporation, and held senior executive positions with The Goodyear Tire & Rubber Company, where he also served on the board of directors. Additionally, Mr. Shaffer is a director on the board of Terex Corporation (NYSE: TEX). He holds a master's degree in management from the Sloan School of Management, Massachusetts Institute of Technology, and a degree in finance and business administration from the University of California, Berkeley.
>
> **Board Committees:**
> ■ Chairman of Audit Committee

**Other Public Company Boards:** Terex Corporation (since 2007)

*Mr. Shaffer brings to the Board:*
■ Senior financial, operational and strategic experience with various large companies;

■ Corporate governance expertise from serving as director of various public companies; and

■ Financial expertise related to his qualifications as an "audit committee financial expert" under SEC regulations.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

61.     By reason of their positions as officers and/or directors of XPO and because of their ability to control the business and corporate affairs of XPO, the Individual Defendants owed XPO and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage XPO in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of XPO and its shareholders so as to benefit all shareholders equally.

62.     Each director, officer, and controller of the Company owes to XPO and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

63.     The Individual Defendants, because of their positions of control and authority as directors, officers, and/or controllers of XPO, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

64.     To discharge their duties, the officers, directors, and controllers of XPO were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

65.    Each Individual Defendant, by virtue of his or her position as a director, officer, and/or controlling shareholder, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors, officers, and controllers of XPO, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers, directors, and/or controllers of the Company has been ratified by the remaining Individual Defendants who collectively comprised XPO's Board at all relevant times.

66.    As senior executive officers, directors, and controllers of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Additionally, the Individual Defendants had a duty not to cause the Company to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of the Company and its shareholders.

67.     To discharge their duties, the officers and directors of XPO were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of XPO were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to XPO's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how XPO conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of XPO and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that XPO's operations would comply with all applicable laws and XPO's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

68.     Each of the Individual Defendants further owed to XPO and the shareholders the duty of loyalty requiring that each favor XPO's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

69.     At all times relevant hereto, the Individual Defendants were the agents of each other and of XPO and were at all times acting within the course and scope of such agency.

70.     Because of their advisory, executive, managerial, directorial, and controlling positions with XPO, each of the Individual Defendants had access to adverse, non-public information about the Company.

71.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by XPO.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

72.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

73.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) to artificially inflate the Company's stock price while the Company repurchased its own stock.

74.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of XPO, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

75.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or

substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

76.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of XPO and was at all times acting within the course and scope of such agency.

## XPO'S CODE OF CONDUCT

77.    The Company's Code of Business Ethics (the "Code of Conduct") states that "[e]veryone at our company is held to the same high standards: our management, board of directors, employees, suppliers and business partners. This makes it easier for us to meet our obligations as a team. The Code also serves to communicate our integrity to the business community and the public at large."

78.    The Code of Conduct provides that the Company is committed to "maintaining the trust of customers and others in our marketplaces by acting with integrity, competing fairly, and protecting confidential information." In connection with the Company's commitment to convey honest and accurate information, the Code of Conduct maintains that XPO's business capabilities are accurately portrayed, stating in relevant part, "XPO accurately portrays its business capabilities. You may not make false or misleading statements about XPO's services or those of our competitors; you should never knowingly misrepresent facts to gain a competitive advantage or for any other purpose."

79.    The Code of Conduct states that XPO complies with the laws of all relevant governments that it does business with, stating that when dealing with a government entity or official, Company employees, officers, and/or directors may not "[m]ake false or misleading statements about XPO's services or capabilities." Further, the Code of Conduct states that:

> XPO complies with all laws and regulations that govern dealings with federal, state, provincial, county and local governments, including entities working on behalf of a government, or owned or controlled by a government. If you are involved in seeking government contract work for XPO, it is particularly important for you to understand and observe all applicable rules. If you have questions or concerns regarding our government contract obligations, contact the Compliance Office or the internal legal counsel for your location or business unit.

80. The Code of Conduct also emphasizes that XPO complies with all laws and regulations governing international trade, stating in relevant part:

> XPO does not permit the export or import of goods, services or data without appropriate authorization. When shipping under a government authorization, you must comply with all terms and conditions of the authorization and you cannot divert shipments to a place or person not included in the authorization. To ensure that the company can comply with government reporting requirements relating to international trade, you must properly document all export and import transactions.

81. The Code of Conduct outlines under a section titled "Protection of Company Assets" that, "[w]e are committed to safeguarding the integrity of XPO's assets, including the information we receive from or provide to shareholders, regulators, business partners and other third parties. We avoid conflicts of interest and we do business on our merits." In the same section, the Code of Conduct states that all public reports must be accurate, timely, and complete, stating in relevant part:

> Our company's senior financial officers must ensure that all financial information disclosed in public communications and in periodic reports with the U.S. Securities and Exchange Commission is complete, accurate, timely and understandable. Persons responsible for preparing such documents must ensure that all accounting records, and the reports produced from such records, fairly and accurately represent the transactions to which they relate. These records and reports must include reasonable detail and be supported by appropriate documentation. If you become aware of anything in the company's accounting records or reports that is false or misleading, inform the company's Chief Legal Officer immediately.

82. The Individual Defendants violated the Code of Conduct by allowing the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate

assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, and failing to report the same.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

83.     XPO purports to be a top ten global provider of cutting-edge supply chain solutions to the most successful companies in the world. The Company derives its revenue from a variety of sectors in which it operates, including retail, e-commerce, food and beverage, consumer packaged goods, and industrial. The Company has two reportable segments, Transportation and Logistics. The Company's Transportation segment consists of a network for transporting customers' goods, primarily by way of owned, brokered, and contracted truck transportation services. The Company's Logistics segment consists of order fulfillment services for goods purchased on the internet, which the Company stores and ships from its warehouse facilities located across the U.S. XPO mainly operates as a transportation service company, providing services to multiple countries through its reportable segments.

84.      Prior to the Relevant Period, XPO was an unprofitable company. This changed during the Company's fiscal quarter ended June 30, 2016 ("2Q16"), when XPO, through the acquisition of another company, inherited a business relationship with Amazon.

85.     Amazon is a multinational technology company based in Seattle, Washington. It is the world's largest online retailer, and one of the world's most valuable companies.

86.     At the outset of XPO's business relationship with Amazon, Amazon informed XPO that it did not intend to continue business operations with XPO over the long term.

87.     2Q16 was the first financial quarter during which XPO turned a profit, and from 2Q16 through at least April 2018, Amazon contributed materially to the Company's profits and growth. During this period, Amazon was XPO's largest customer.

88.     Although XPO did not disclose that Amazon was its largest customer until February 15, 2019, the Company's annual report filed with the SEC for the fiscal year ended December 31, 2016 on a Form 10-K (the "2016 10-K") stated that business with the Company's largest customer made up "approximately 3%," or roughly $43.8 million of XPO's $14.6 billion in revenue for the fiscal year ended December 31, 2016.

89.     XPO purposefully omitted the language referencing its largest customer's contribution to the Company's revenue in its annual report filed with the SEC for the fiscal year ended December 31, 2017 on a Form 10-K (the "2017 10-K").[5]

90.     On July 17, 2017, the Company announced a planned registered offering (the "Offering") of 11,000,000 shares of its common stock.

91.     On July 20, 2017, the Company filed a registration statement on Form S-3 (the "Registration Statement") and a Rule 424(b) Prospectus (the "Prospectus") with the SEC, in connection with the Offering. On or about that same day, the Company priced the 11,000,000 shares to be issued in connection with the Offering at $60.50 per share.

92.     The Registration Statement and Prospectus were signed by Defendants Jacobs and Hardig, and incorporated the 2016 10-K and the Company's quarterly report for the fiscal quarter ended March 31, 2017 filed with the SEC on Form 10-Q (the "1Q17 10-Q") by reference.

---

[5] The Company's 2018 10-K revealed that XPO's largest customer had generated approximately $900 million for the Company during the fiscal year ended December 31, 2018. As such, the Company's business with Amazon increased the Company's revenue, earnings, and cashflow by approximately 105%.

93.     The Company was required to adequately disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" in connection with the Offering, as required by Item 303 of SEC Regulation S-K, 19 C.F.R. §229.303 ("Item 303").

94.     On April 23, 2018, XPO issued a press release revealing that it had hired Amazon's Head of Finance for Worldwide Transportation and Logistics, Kenneth Wagers III, to serve as XPO's Chief Operating Officer ("COO").  Wagers' employment agreement with XPO included a provision specifically preventing him from returning to work at Amazon for a period of several years.

95.     A day later, on April 24, 2018, XPO issued a press release announcing XPO Direct, an order distribution service for businesses engaged in e-commerce. The Company purported that XPO Direct would allow businesses to deliver their goods nearly anywhere in the U.S. within two days, "at a fraction of the usual cost." A February 18, 2019 Deutsche Bank report on XPO Direct noted that XPO Direct was "similar, if not exactly like Fulfillment by Amazon."

96.     Fulfillment by Amazon ("Amazon FBA") is a service provided by Amazon that handles the storage, packaging, and shipping of merchandise for third-party sellers. It is a critical component of Amazon's overall business model, and generates billions of dollars in sales revenue for Amazon.

97.     On April 25, 2018, Defendant Jacobs rang the Opening Bell at the NYSE to mark the launch of XPO Direct.

98.     Amazon has a well-known reputation for being extremely aggressive with competing businesses, and the Defendants were likely aware that hiring away one of Amazon's

top executives, and announcing a service that would directly compete with Amazon FBA could provoke Amazon into accelerating its plans to end its business relationship with XPO.

99.     Predictably, between the end of March and the beginning of April 2018, Amazon began to execute its stated plans to end its business relationship with XPO, as evidenced by a number of instances of Amazon scaling back its operations with XPO in the Company's Transportation segment and at the Company's warehouse facilities during the first half of 2018.

100.    XPO reported a decline of approximately 1.1% in its tonnage figures during March 2018, which continued to decline throughout the remainder of 2018. Tonnage is a measure of weight shipped, which the Company uses to evaluate the amount of freight handled by its Transportation segment. This decline roughly coincided with the beginning of Amazon scaling back its business with XPO. Prior to March 2018, XPO's tonnage figures had been consistently increasing.

101.    To illustrate, XPO's Aberdeen, Maryland warehouse shipped between 11,000 and 12,000 units of freight each day during Amazon's critically important "Amazon Prime" week in July 2017. During the July 2018 Amazon Prime week, only about 4,000 units were shipped each day from the Aberdeen, Maryland facility. XPO's other facilities experienced similar declines in Amazon-related shipping during this period.

102.    Between April 2018 and July 2018, Amazon winded down its business at XPO Edgerton, a warehouse in Edgerton, Kansas that XPO operated for Amazon, by decreasing its inbound and outbound merchandise at the facility. XPO Edgerton was especially important as a hub for XPO's Logistics segment, due to its central location in the U.S. and its access to important transportation infrastructure.

103.    This eventually caused XPO to close down XPO Edgerton, though the Company did not announce the closing of the facility until January 2019.

104.    Between June 2018 and October 2018, Amazon similarly winded down its business at XPO's "AZM" warehouse in Baltimore, Maryland and XPO's "AZT" warehouse in Fort Worth, Texas. As a result, XPO enacted mass layoffs at both its AZM and AZT warehouses, and later closed down its AZM warehouse in March 2019.

105.    Moreover, a number of XPO and Amazon employees during this period noticed certain "red flags" at both XPO and Amazon warehouses indicating that Amazon had begun withdrawing its business.[6] These "red flags" included the slowing down of inbound and outbound Amazon merchandise, warehouse racks used to store Amazon merchandise at XPO facilities "getting pretty empty," a decrease in the number of XPO trailers at Amazon warehouses, and a slowing down of worker activity at XPO warehouses during peak months.

106.    Taken together, the events referenced in ¶¶99–105 would have made it clear to the Individual Defendants that Amazon had begun to act on its stated plan to end its business relationship with the Company.

107.    Moreover, on July 19, 2018, after a private meeting between Company representatives and Deutsche Bank analysts, Deutsche Bank published a report stating that the Company "expected [XPO Direct] to be a $1B revenue business in a 'few years' – from $0 last year." This demonstrates that the Individual Defendants were likely aware that the Company's other revenue sources, such as XPO Direct, would not be able to compensate for the decline in the Company's revenue flowing from the loss of the Company's Amazon business.

---

[6] The Securities Class Action includes excerpts from interviews with former employees of the Company and an Amazon manager that support the allegations contained herein that the Individual Defendants were aware that Amazon had begun withdrawing its business from XPO.

108.   As Amazon continued to wind down its businesses with XPO, on August 1, 2018, shortly before the Company issued its financial statements for the fiscal quarter ended June 30, 2018, Defendant Hardig resigned from his position as CFO. The Company gave no reason for his departure.

109.   On October 31, 2018, shortly before the Company issued its financial statements for the fiscal quarter ended September 30, 2018, the Company announced that Defendant Malat would be resigning from his position with the Company.

110.   Defendants Hardig and Malat, along with Defendant Jacobs, were the Company executives responsible for discussing the Company's financial condition with investors in the conference calls held after the release of the Company's quarterly and yearly financial statements.

**False and Misleading Statements**

*August 3, 2016 2Q16 Press Release and Presentation*

111.   On August 3, 2016, XPO issued a press release detailing its financial results for the fiscal quarter ended June 30, 2016 (the "2Q16 Press Release").

112.   That same day, XPO also issued a presentation and script, which stated that XPO was a "well diversified company," and had a "highly diversified" customer base.

*August 4, 2016 Conference Call*

113.   On August 4, 2016, XPO held a conference call, during which Defendant Jacobs addressed the financial results detailed in the 2Q16 Press Release and took questions from investors and analysts. In relevant part, Defendant Jacobs stated:

> We started the call with saying that we're at a positive inflection point in the evolution of our Company. And that we are reaping the rewards of the last five years. We have built a very well diversified, well functioning global business that provides significant value to our customers.

> The proof is in the pudding. Look at the numbers this quarter. We had record EBITDA, way above expectations. We had record cash flow from ops, way above expectations. Record free cash flow. We have a clearly defined action plan to go from $1.265 billion of EBITDA this year to our $1.7 billion target in 2018.

**August 8, 2016 Form 10-Q**

114.   On August 8, 2016, the Company filed with the SEC its quarterly report for the fiscal quarter ended June 30, 2016 on a Form 10-Q (the "2Q16 10-Q"). The 2Q16 10-Q was signed by Defendants Jacobs and Hardig, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Jacobs and Hardig attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

115.   The 2Q16 10-Q included a list of risk factors, incorporated by reference from the Company's annual report for the fiscal year ended December 31, 2015 on a Form 10-K (the "2015 10-K"), which contained the following statement:

> No single customer accounted for more than 2% of our consolidated pro forma revenue for 2015. We do not believe the loss of any single customer would materially impair our overall financial condition or results of operations; however, collectively, some of our large customers might account for a relatively significant portion of the growth in revenue and margins in a particular quarter or year. Our contractual relationships with customers generally are terminable at will by the customers on short notice and do not require the customer to provide any minimum commitment. Our customers could choose to divert all or a portion of their business with us to one of our competitors, demand rate reductions for our services, require us to assume greater liability that increases our costs, or develop their own logistics capabilities. Failure to retain our existing customers or enter into relationships with new customers could materially impact the growth in our business and the ability to meet our current and longterm financial forecasts.

**November 2, 2016 3Q16 Press Release and Presentation**

116.   On November 2, 2016, XPO issued a press release detailing its financial results for the fiscal quarter ended September 30, 2016 (the "3Q16 Press Release").

117.    That same day, XPO also issued a presentation and script, which stated that XPO was "well diversified," and had a "highly diversified" customer base.

### November 3 Conference Call

118.    On November 3, 2016, XPO held a conference call, during which Defendant Jacobs addressed the financial results detailed in the 3Q16 Press Release and took questions from investors and analysts. During the call, Defendant Jacobs stated that XPO had "reached a positive inflection point in the evolution of [its] business," and that XPO's strategy had been "to be very well diversified, well diversified by geography, well diversified by type of customer, well diversified by service offering."

### November 8, 2016 Form 10-Q

119.    On November 8, 2016, the Company filed with the SEC its quarterly report for the fiscal quarter ended September 30, 2016 on a Form 10-Q (the "3Q16 10-Q"). The 3Q16 10-Q was signed by Defendants Jacobs and Hardig, and contained SOX certifications signed by Defendants Jacobs and Hardig attesting to the accuracy of the 3Q16 10-Q.

120.    The 3Q16 10-Q included a list of risk factors, incorporated by reference from the 2015 10-K, which contained the following statement:

> No single customer accounted for more than 2% of our consolidated pro forma revenue for 2015. ***We do not believe the loss of any single customer would materially impair our overall financial condition or results of operations***; however, collectively, some of our large customers might account for a relatively significant portion of the growth in revenue and margins in a particular quarter or year. Our contractual relationships with customers generally are terminable at will by the customers on short notice and do not require the customer to provide any minimum commitment. Our customers could choose to divert all or a portion of their business with us to one of our competitors, demand rate reductions for our services, require us to assume greater liability that increases our costs, or develop their own logistics capabilities. Failure to retain our existing customers or enter into relationships with new customers could materially impact the growth in our business and the ability to meet our current and longterm financial forecasts.

(Emphasis added).

### *February 21, 2017 Press Release and Presentation*

121.    On February 21, 2017, XPO issued a press release detailing its financial results for the fiscal year ended December 31, 2016. (the "Fiscal 2016 Press Release").

122.    That same day, XPO also issued a presentation and script, which stated that XPO was "well diversified," and had a "highly diversified" customer base.

### *February 28, 2017 Form 10-K*

123.    On February 28, 2017, the Company filed with the SEC its 2016 10-K, which was signed by all of the Individual Defendants, as well as non-party Global Chief Accounting Officer Lance A. Robinson. The 2016 10-K contained SOX certifications signed by Defendants Jacobs and Hardig attesting to the accuracy of the 2016 10-K.

124.    In relevant part, the 2016 10-K stated that the Company had a "diversified customer base that minimizes our concentration risk: in 2016, approximately 8% of our revenue was attributable to our top five clients, with our largest customer accounting for approximately 3% of revenue."

### *April 17, 2017 Proxy Statement*

125.    The Company filed its 2017 Proxy Statement with the SEC on April 17, 2017. Defendants Jacobs, Ashe, DeJoy, Jesselson, Kingshott, Papastavrou, and Shaffer solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[7]

---

[7] Plaintiffs' allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

126.    The 2017 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[w]e have a Code of Business Ethics that applies to our directors and executive officers. This code is designed to deter wrongdoing, to promote the honest and ethical conduct of all employees and to promote compliance with applicable governmental laws, rules and regulations, as well as to provide clear channels for reporting concerns."

127.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

128.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to strongly correlate pay and performance, in order to "to align the interests of our executive team with the interests of our stockholders" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

129.    The 2017 Proxy Statement also failed to disclose, *inter alia,* that: (1) a significant amount of the Company's growth was due to its business relationship with Amazon, the Company's largest customer; (2) as a result of its dependence on this relationship, the Company was not as well diversified as it purported to be; (3) Amazon had made clear to the Company that the Company's business relationship with Amazon was only going to be temporary; (4) the dissolution of the Company's business relationship with Amazon would have a significantly negative effect on the Company's growth and financial condition; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

*May 3, 2017 1Q17 Press Release and Presentation*

130.    On May 3, 2017, XPO issued a press release detailing its financial results for the fiscal quarter ended March 31, 2017 (the "1Q17 Press Release").

131.    That same day, XPO also issued a presentation and script, which stated that XPO was "well diversified," and had a "highly diversified" customer base.

*May 4, 2017 Conference Call*

132.    On May 4, 2017, XPO held a conference call, during which Defendant Jacobs addressed the financial results detailed in the 1Q17 Press Release and took questions from investors and analysts. During the call, an analyst for KeyBanc asked Defendant Jacobs the following question:

> Let me ask it this way, is there anything in the first quarter that you view as being unsustainable or anything that kind of helped you if it was fuel trends in the LTL business or something that you're watching that, that may not repeat in the first quarter as you think about the progression through the year?

133.    Defendant Jacobs responded as follows:

> I don't, Todd. I think the first quarter was a quarter where we had to work hard. And we had some headwinds, we had some tailwinds. But internally, as an organization, it's really jelling. And people are very focused on the right levers in order to improve both the profitability of the company and customer service at the same time. And it's broad-based by our different business lines and by our geography. So I am optimistic about the year, starting off on a very good foot.

*May 9, 2017 Form 10-Q*

134.    On May 9, 2017, the Company filed with the SEC the 1Q17 10-Q. The 1Q17 10-Q was signed by Defendants Jacobs and Hardig, and contained SOX certifications signed by Defendants Jacobs and Hardig attesting to the accuracy of the 1Q17 10-Q.

135.    The 1Q17 10-Q stated that the Company's customers are "highly diversified across every major industry, with retail and e-commerce historically accounting for approximately a quarter of our revenue."

**July 20, 2017 Registration Statement and Prospectus**

136.    On July 17, 2017, the Company issued a press release announcing its plans to issue 11,000,000 shares of its common stock through the Offering.

137.    On or about July 20, 2017, the Company filed a registration statement on Form S-3 (the "Registration Statement") and a Rule 424(b) Prospectus (the "Prospectus") with the SEC, in connection with the Offering. On or about that same day, the Company priced the 11,000,000 shares to be issued in connection with the offering at $60.50 per share.

138.    The Registration Statement and Prospectus were signed by Defendants Jacobs and Hardig, and incorporated the 2016 10-K and the 1Q17 10-Q by reference.

139.    The Registration Statement and Prospectus were false and misleading because they failed to disclose the impact of XPO's dependence on its business with Amazon, and the impending cessation of that business on the Company's material trends and uncertainties, as required by Item 303.

**August 2, 2017 2Q17 Press Release and Presentation**

140.    On August 2, 2017, XPO issued a press release detailing its financial results for the fiscal quarter ended June 30, 2017 (the "2Q17 Press Release").

141.    That same day, XPO also issued a presentation and script, which stated that XPO had a "highly diversified" customer base.

**August 4, 2017 Form 10-Q**

142.   On August 4, 2017, the Company filed with the SEC its quarterly report for the fiscal quarter ended June 30, 2017 on a Form 10-Q (the "2Q17 10-Q"). The 2Q17 10-Q was signed by Defendants Jacobs and Hardig, and contained SOX certifications signed by Defendants Jacobs and Hardig attesting to the accuracy of the 2Q17 10-Q.

143.   The 2Q17 10-Q stated that the Company's customers are "highly diversified across every major industry, with retail and e-commerce historically accounting for approximately a quarter of our revenue."

### November 2, 2017 3Q17 Press Release and Presentation

144.   On November 2, 2017, XPO issued a press release detailing its financial results for the fiscal quarter ended September 30, 2017 (the "3Q17 Press Release").

145.   That same day, XPO also issued a presentation and script, which stated that XPO had a "highly diversified" customer base.

### November 6, 2017 Form 10-Q

146.   On November 6, 2017, the Company filed with the SEC its quarterly report for the fiscal quarter ended September 30, 2017 on a Form 10-Q (the "3Q17 10-Q"). The 3Q17 10-Q was signed by Defendants Jacobs and Hardig, and contained SOX certifications signed by Defendants Jacobs and Hardig attesting to the accuracy of the 3Q17 10-Q.

147.   The 3Q17 10-Q stated that the Company's customers are "highly diversified across every major industry, with retail and e-commerce historically accounting for approximately a quarter of our revenue."

### February 7, 2018 Press Release and Presentation

148.   On February 7, 2018, XPO issued a press release detailing its financial results for the fiscal year ended December 31, 2017 (the "Fiscal 2017 Press Release").

149.    That same day, XPO also issued a presentation and script, which stated that XPO had a "highly diversified" customer base.

150.    With respect to the Company's financial guidance and target outlook for 2018, the Fiscal 2017 Press Release stated that for "2018, [XPO] reaffirmed [its] target for adjusted EBITDA of at least $1.6 billion, and raised [its] 2017–2018 cumulative free cash flow target to approximately $1 billion, from approximately $900 million."

151.    The Fiscal 2017 Press Release was false and misleading because the financial guidance it contained did not reflect Amazon's winding down of its business with the Company, which would have a material effect on the Company's financial condition during 2018.

### *February 12, 2018 Form 10-K*

152.    On February 12, 2018, the Company filed with the SEC its 2017 10-K, which was signed by all of the Individual Defendants, as well as non-party Global Chief Accounting Officer Lance A. Robinson, and which contained SOX certifications signed by Defendants Jacobs and Hardig attesting to the accuracy of the 2017 10-K.

153.    In relevant part, the 2017 10-K stated that the Company had a "diversified customer base that minimizes our concentration risk: in 2017, approximately 10% of our revenue was attributable to our top five customers."

154.    The 2017 10-K did not include the language contained in the 2016 10-K referencing XPO's largest customer's contribution to the Company's revenue.

### *April 18, 2018 Proxy Statement*

155.    The Company filed its 2018 Proxy Statement with the SEC on April 18, 2018. Defendants Jacobs, Ashe, DeJoy, DeSalva, Jesselson, Kingshott, Papastavrou, and Shaffer

solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[8]

156.    The 2018 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[w]e have a Code of Business Ethics that applies to our directors and executive officers. This code is designed to deter wrongdoing, to promote the honest and ethical conduct of all employees and to promote compliance with applicable governmental laws, rules and regulations, as well as to provide clear channels for reporting concerns."

157.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

158.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to strongly correlate pay and performance, in order to "to align the interests of our [non-executive officers] with the interests of our stockholders" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

159.    The 2018 Proxy Statement also failed to disclose, *inter alia,* that: (1) a significant amount of the Company's growth was due to its business relationship with Amazon, the Company's largest customer; (2) as a result of its dependence on this relationship, the Company was not as well diversified as it purported to be; (3) Amazon had made clear to the Company that

---

[8] Plaintiffs' allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

the Company's business relationship with Amazon was only going to be temporary; (4) the dissolution of the Company's business relationship with Amazon would have a significantly negative effect on the Company's growth and financial condition; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### May 2, 2018 1Q18 Press Release and Presentation

160.     On May 2, 2018, XPO issued a press release detailing its financial results for the fiscal quarter ended March 31, 2018 (the "1Q18 Press Release").

161.     That same day, XPO also issued a presentation and script, which stated that XPO's "markets" (rather than its customers) were "highly diversified."

162.     The 1Q18 Press Release also reaffirmed the 2018 financial guidance and target outlook that had been given in the Fiscal 2017 Press Release.

163.     The 1Q18 Press Release was false and misleading because the financial guidance it contained did not reflect Amazon's winding down of its business with the Company, which was already having a material effect on the Company's financial condition during 2018.

### May 3, 2018 Conference Call

164.     On May 3, 2018, XPO held a conference call, during which Defendant Jacobs addressed the financial results detailed in the 1Q18 Press Release and took questions from investors and analysts. During the call, Defendant Jacobs stated that the Company was "on track to deliver on [its] targets of at least $1.6 billion of adjusted EBITDA this year and approximately $1 billion of cumulative free cash flow for 2017 and 2018."

165.     During the May 3, 2018 conference call, an analyst for Deutsche Bank asked Defendant Jacobs the following question:

[I]s there any kind of reason to think the revenue and EBITDA growth of the business is actually very strong, not even just the 11% or the 10.4% you did last quarter, but really kind of even within that high single-digit framework that you provided. Is there any reason to think kind of that type of revenue growth and EBITDA growth that you're achieving even this year slows? If you can just help us think about that as you look at the pipeline of new business, because that is kind of top of mind right now, especially in the Transportation segment?

166.    Defendant Jacobs responded as follows:

There is **_no reason_** to think it's going to slow, and I don't know that we're in any better position than everyone else to predict what the economy is going to do over the next few years. . . . So for the time being and for the foreseeable future, absent some geopolitical events, life looks good, at least from our point of view just looking at our customers and seeing what our customers are doing and saying.

(Emphasis added).

167.    The statements referenced in ¶166 were false and misleading because Defendant Jacobs was or should have been aware that (1) the Company's internal projections showed that Amazon would generate over $950 million for the company in 2018; (2) Amazon had begun to act on its stated plans to end its business relationship with the Company; and (3) as result, the Company's revenue and EBITDA growth would likely slow.

168.    Analysts reacted positively to Defendant Jacobs' statements during the May 3, 2018 conference call. On May 4, 2018, Morgan Stanley issued a report echoing Defendant Jacobs' optimistic statements about the Company's growth and prospects, stating, in relevant part:

We see little to no threat of new entrants being able to make a mark quickly in the last mile space despite recent headlines and we believe CL [contract logistics] remains one of the last businesses to be 'Amazon-ized' as XPO's large retail and industrial customers are likely unwilling to hand over their entire supply chains to AMZN to control.

### May 9, 2018 "Mad Money" Segment

169.    On or about May 9, 2018, Defendant Jacobs appeared as a guest on "Mad Money," a television show broadcast on CNBC that provides commentary on investment and speculation in

43

publicly traded stocks.  The host of the show, Jim Cramer, stated to viewers, "To the extent that any investors had any concerns about XPO's relationship with Amazon, Jacobs reassured them that they had nothing to worry about."

170.    During the show, in response to a statement by Cramer that XPO and Amazon had a "synergistic" relationship, Defendant Jacobs stated that, "Amazon's growing so much faster than we are. We're proud that we grew 11% (organically) in the first quarter, so compared to other transportation companies, we're at the top. Amazon grew 45%."

171.    Cramer then stated "[b]ut you play a big role in trying to get bigger . . . packages to people[] everywhere."

172.    Defendant Jacobs replied "Absolutely. And we have Amazon as a customer and we have many other ecommerce players as a customer. We're facilitating their growth."

***August 1, 2018 2Q18 Press Release***

173.    On August 1, 2018, XPO issued a press release detailing its financial results for the fiscal quarter ended June 30, 2018 (the "2Q18 Press Release").

174.    In relevant part, the 2Q18 Press Release stated that the Company was "on track to deliver on [its] target of at least $1.6 billion of adjusted EBITDA this year, which reflects a 17% increase over 2017."

***August 2, 2018 Conference Call***

175.    On August 2, 2018, XPO held a conference call, during which Defendant Jacobs addressed the financial results detailed in the 2Q18 Press Release and took questions from investors and analysts. During the call, an analyst for Citigroup asked Defendant Jacobs, "[i]n terms of revenue, does it feel like a decent run rate to think about for the back half? Just trying to get a sense of how that looks."

176.    In response, Defendant Jacobs stated, "[y]es, in this range. We've always been saying for the last few months, high single digits, low double digits and nothing's slowed down at all in terms of that guidance."

177.    During the August 2, 2018 conference call, an analyst for Deutsche Bank further questioned Defendant Jacobs about XPO's growth, stating:

> Just want to understand is kind of the 17% or mid-teens type EBITDA growth that you're posting this year sustainable in your view, as you look through '19 and '20, given the book of business and then, does the CapEx intensity change at all. I think you're running about 2.8% of sales this year. Does that actually go down as the sales growth, or should we expect that to kind of move up, given some of the initiatives that you're accelerating?

178.    Defendant Jacobs responded by claiming that he did not see "any slowing down" of the Company's growth, stating, in relevant part:

> Sure.  So let's do all 3 lines. Let's do organic revenue growth, let's do EBITDA growth, let's go free cash flow/CapEx since they're related to each other.  On the sales side, on the revenue growth side, very buoyant, that's partly because it's a good economy, it's a good market. It's partly because we're doing a lot of company-specific things in terms of operational excellence, in terms of hitting on all 8 cylinders that customers are rewarding us with our greater-than-fair share of their wallet. So I expect that organic revenue growth is going to stay in this high level, high single digits, low-double digits for the foreseeable future. I don't see any slowing down on that. EBITDA, we haven't done a bottoms-up budget yet at all, that process is just starting. On a preliminary basis, yes, I think something in the 15% to 18% range is very reasonable to assume for continued EBITDA growth for the foreseeable future.
>
> In terms of free cash flow, we will generate more free cash flow next year than we did this year, even though we've generated very substantial amount of free cash flow this year. And this year we'll have about 70-something percent more free cash flow than last year. I don't think it's going to be 70% more, because I think there's going to be more opportunities for deploying CapEx, but it's way too early in this year to be giving specific guidance for CapEx for next year. But I can tell you this: last week, we had about 45 of our top executives in for 3 days for quarterly operating review. People are confident in their business. Peoples' customers are confident in their business

179.    The statements referenced in ¶¶176 and 178 were false and misleading because the financial guidance Defendant Jacobs reaffirmed did not reflect Amazon's winding down of its business with the Company, which was already having a material effect on the Company's financial condition, as evidenced by the 2% decline in the Company's growth during 2Q18.

*October 31, 2018 3Q18 Press Release*

180.    On October 31, 2018, XPO issued a press release detailing its financial results for the fiscal quarter ended September 30, 2018 (the "3Q18 Press Release").

181.    The 3Q18 Press Release disclosed that XPO had missed its earnings and revenue expectations for the quarter as a result of a "customer bankruptcy."

182.    The 3Q18 Press Release was false and misleading because the Company did not miss its earnings and revenue expectations for the quarter merely because of a "customer bankruptcy"; rather, the missed expectations were in large part caused by the loss of the Company's Amazon business.

*November 1, 2018 Conference Call*

183.    On November 1, 2018, XPO held a conference call, during which Defendant Jacobs addressed the financial results detailed in the 3Q18 Press Release and took questions from investors and analysts.

184.    During the call, Defendant Jacobs claimed that the Company had "miss[ed] the quarter" due to a "rounding error" made by House of Fraser, one of XPO's customers.

185.    A KeyBanc analyst questioned Defendant Jacobs with respect to the "rounding error" through the following exchange:

> [KeyBanc analyst:] I guess, just maybe a housekeeping one to start.  Brad [Jacobs], do you have – what is the annual EBITDA run rate from the customer bankruptcy that happened here in the quarter?

[Jacobs:] It was mid – low single-digit millions EBITDA.

[KeyBanc analyst:] On a full year basis, it was a low single digits of EBITDA?

[Jacobs:] Yes, which is – which still really bothered us because here, we are, making low-single-digit millions in EBITDA, and we let our heart get ahead of our mind in trying to support a customer and ended up writing-off $16 million. But c'est la vie.

[KeyBanc analyst:] Okay. Got it. And then – so we think about the growth rates going forward though it's not a huge comp to overcome that on an annual basis?

[Jacobs:] It's a rounding error, but it made us miss the quarter, which is something we work really hard not to do. So on a long-term basis, it's really just – it's nothing. It's a few million bucks.

186.    Defendant Jacobs also stated that the Company had revised its financial guidance

for 2018 to $1.585 billion, stating, in relevant part:

We generated [third quarter 2018] adjusted EBITDA of $415 million despite a $16 million headwind from a customer bankruptcy in Europe.

We've updated our full year 2018 target for adjusted EBITDA to approximately $1.585 billion. The revised target reflects the impact of the customer bankruptcy I mentioned earlier. And we've reaffirmed our target for approximately $1 billion of cumulative free cash flow over 2017 and '18.

Given our strategic positioning, we expect to continue to outpace the market in any macro environment, and we're looking at some exciting opportunities to accelerate that growth through acquisitions. Now, as you saw from yesterday's release, Scott [Malat] will be leaving us in December.

187.    Also during the call, with respect to the Company's declining tonnage figures,

Defendant Malat stated:

Our LTL tonnage declined 1.5% due to our decision to selectively target more profitable freight, partially offset by a 3% volume increase in higher-margin local freight. We were able to further reduce our purchased transportation costs by increasing utilization of our owned trucks to offset inflation. Purchased transportation made up 26% of our linehaul miles in the quarter versus 33% from a year ago.

188.    Defendant Jacobs also commented on the Company's tonnage figures during the call, stating,

> Tonnage was down, though. Tonnage was down 1.5%, which is in-line with recent quarters and consistent with our strategy of selectively targeting the more – the freight that fits our network best, more profitable freight. And you mentioned the investment in the local sales force. I'm very happy that we did that. And the proof's in the pudding, where our local tonnage was up 3% in the third quarter.

189.    The statements referenced in ¶¶184–185 were false and misleading because the Company did not miss its earnings and revenue expectations for the quarter merely because of a "customer bankruptcy"; rather, the missed expectations were in large part caused by the loss of the Company's Amazon business.

190.    The statements referenced in ¶186 were false and misleading because the revised financial guidance of $1.585 billion did not reflect Amazon's winding down of its business with the Company, which would have a material effect on the Company's financial condition during 2018.

191.    Following the November 1, 2018 conference call, the price of the Company's stock fell 2.67% from $89.38 at the close of business on October 31, 2018 to $86.99 at the close of business on November 1, 2018.

192.    The statements referenced in ¶¶111–124, 130–138, 140–150, 152–154, 160–162, 164, 166, 169–170, 172–176, 178, 180–181, and 183–188 were materially false and/or misleading because they failed to disclose, *inter alia*, that: (1) a significant amount of the Company's growth was due to its business relationship with Amazon, the Company's largest customer; (2) as a result of its dependence on this relationship, the Company was not as well diversified as it purported to be; (3) Amazon had made clear to the Company that the Company's business relationship with Amazon was only going to be temporary; (4) the dissolution of the Company's business

relationship with Amazon would have a significantly negative effect on the Company's growth and financial condition; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

193. On December 11, 2018, at a private lunch with investors, an XPO executive disclosed material nonpublic information concerning the Company's loss of Amazon business.

194. NYSE trading authorities quickly became aware of the information disclosed at the lunch and halted the trading of XPO stock on the NYSE when the market opened on December 12, 2018. As a result, XPO was forced to reveal publicly later that day that (1) the Company would have to accelerate the use of practically all of its available $188 million in tax benefits in order to reach its 2018 free cash flow guidance of $625 million, (2) the Company would be revising its 2019 free cash flow guidance, and (3) the Company would be revising its "base-case" growth assumptions to 12%–15% growth, down from 15%–18% growth. These material changes to the Company's financial prospects all stemmed from the Company's loss of Amazon business.

195. The Company's December 12, 2018 statement was made in the form of a Regulation FD Disclosure, and stated, in relevant part:

> On December 11, 2018, XPO Logistics, Inc. (the "Company") met with a group of investors in the ordinary course of its investor relations activities.
>
> At this meeting, the Company disclosed that it anticipates 12-15% year-over-year growth in adjusted EBITDA in 2019. Adjusted EBITDA is a non-GAAP measure.
>
> In addition, at this meeting, the Company reaffirmed that it remains on track to generate approximately $625 million of free cash flow for 2018, and expects to generate approximately $650 million of free cash flow for 2019. Free cash flow is a non-GAAP measure.

On February 12, 2018, the Company disclosed in its annual report on Form 10-K for the year ended December 31, 2017 that, as of yearend, the Company had federal net operating losses for all U.S. operations of $188.1 million and federal tax credit carryforwards of $34.4 million. The Company expects to utilize substantially all of its federal net operating losses for the 2018 tax year.

196.    Upon the release of this news, XPO's share price plunged from $66.69 at the close of trading on December 11, 2018 to $44.50 at close on December 13, 2018, representing a loss of approximately 33% of XPO's total market value.

197.    On December 13, 2018, Spruce Point Capital Management published a report on the Company (the "Spruce Report"), criticizing the Company's management and the truthfulness of the Company's financial disclosures. The Spruce Report also maintained that the Company was "executing an identical playbook to [United Rentals, Inc. ('URI')]," which had been under fire in recent years for its involvement in accounting fraud. Notably, URI was co-founded by Defendant Jacobs, and has ties to several of the other Individual Defendants.

198.    The Company responded to the Spruce Report in a Comtex News Network article published at 9:10 a.m. (EST) on December 14, 2018, stating, in relevant part:

> Today's report from a short selling firm is intentionally misleading, with significant inaccuracies, and fails to reflect that XPO has delivered strong performance for its long-term shareholders. The facts demonstrate that [Spruce Point's] claims, most of which have been previously floated and refuted, are largely baseless and an attempt to string together unrelated pieces of incorrect information to paint an inaccurate impression of the company. Of particular note, our accounting practices are based on Generally Accepted Accounting Principles and are audited annually and reviewed quarterly by our independent auditors. XPO's long-term financial outlook remains positive. We will communicate directly with our investors and customers regarding [Spruce Point's] report.

199.    Even this statement was false and misleading because the Individual Defendants were or should have been aware that Amazon was winding down its business with the Company, and as such the Company's "long-term financial outlook" was not "positive."

200.    As a result of the December 12, 2018 disclosure and subsequent stock drop, the Company was unable to complete a planned merger with another similarly-sized company, which would have doubled the Company's size, and allowed the Company to consolidate its financial statements with those of the other company. This would have also allowed the Company to conceal the effects of certain of its Amazon-related losses during the fiscal year ended December 31, 2018.

201.    On February 14, 2019, as a result of the Company's inability to find a merger partner with which the Company could consolidate its financial statements, the Company had to file standalone financial statements for the fiscal year ended December 31, 2018.

202.    On February 15, 2019, Defendant Jacobs held a conference call to address the Company's financial statements filed the previous day. During the call, Defendant Jacobs stated that "we missed the quarter. . . . [a]nd in December, our largest customer pulled back their postal injection business, which is part of last mile. That affected our EBITDA in December. This had a significant impact in December and in the quarter."

203.    During the February 15, 2019 conference call, Defendant Jacobs finally admitted that he knew Amazon's relationship with XPO was never going to be permanent, and that the end of XPO's relationship with Amazon would have a material negative impact on XPO's growth, stating, in relevant part:

> [H]ave we grown with [our largest customer]? Yes, we grew a lot up with them over the last few years. And we knew that, that business wasn't going to stay forever and forever and ever and ever because of that particular customer's stated business plans and because that customer is transactional in some respect in terms of the nature that they have with their vendors.

204.    In response to Defendant Jacobs' admission, a Bank of America Merrill Lynch analyst questioned Defendant Jacobs about the Company's reliance on its business with certain particular customers such as Amazon, stating, in relevant part:

So I wanted to start talking about customer concentration. One of the things that I think XPO has touted as one of its strengths is that it's not overly focused on any particular customer. But here, we've seen kind of 2 quarters in a row where some disappointing news from a particular customer has really put a real dent in results. And I want to talk about – I kind of want to get your thoughts on the extent to which maybe that perception is changing or how you manage your customer base maybe has shifted? . . .

205.    Defendant Jacobs' response was as follows:

Well, in 2018, our top 5 customers represented about 11% of revenue, and you saw that in the K. The largest customer, however, represented roughly about 4%, 5% of that. 2/3 of that business has gone away, so that's a body blow, no question about it. Going forward, with that customer having downsized, we anticipate that our top 5 customers in 2019 will represent about 8% of revenue. So customer concentration will be less. But when you lose your – when you lose the majority of your top customer's business, that hurts. Nothing you can do – there's nothing positive. It's only negative.

206.    Later on during the February 15, 2019 conference call, Defendant Jacobs acknowledged XPO's overreliance on particular customers, revealing that the Company's top 5 customers made up "about 11% of the Company's revenue," with the largest customer making up "a little more than ½ half of that." In relevant part, Defendant Jacobs stated:

I'd also talk to you about our customer concentration. Our customer concentration, it was too much. We made a mistake letting one customer get $900 million of business with us. [It was] just too much. [It was] too much concentration. Previously, if you looked at our top 5 customers, it was about 11% of revenue and the biggest one was a little more than 1/2 of that, so it was just too much concentration. Going forward, we're going to be much more diversified. Our top 5 customers this year should be something around 7% of revenue and no customer will be more than 2% of revenue.

207.    Immediately after the February 15, 2019 conference call, XPO's share price dropped from $59.55 at the close of trading on February 14, 2019 to $51.97 at the close of trading on February 15, 2019, representing a loss of approximately 12.73% of XPO's market value.

**Repurchases During the Relevant Period**

208.     During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company.[9]

209.     According to the 2018 10-K, the Company purchased 10 million shares of its common stock during the month of December 2018 for approximately $536 million.

210.     As the Company's stock was actually only worth $51.97 per share, the price at closing on February 14, 2019, the Company paid on average $1.49 more than the actual worth of each share during the month of December 2018. Thus, the total over payment by the Company for repurchases of its own stock during the month of December 2018 was approximately $16.3 million.

211.     According to the 2018 10-K, the Company purchased 8 million shares of its common stock between January 1, 2019 and February 14, 2019 for approximately $464 million.

212.     As the Company's stock was actually only worth $51.97 per share, the price at closing on February 14, 2019, the Company paid on average $7.50 more than the actual worth of each share during the months of January and February 2019. Thus, the total over payment by the Company for repurchases of its own stock during the months of January and February 2019 was approximately $48.2 million.

213.     In total, the Company overpaid an aggregate amount of approximately $64.5 million for repurchases of its own stock during the period of time in which the Company made false and misleading statements and omissions.

## DAMAGES TO XPO

---

[9] The amount of stock repurchased and referenced in this section includes shares purchased in both open market and private repurchase transactions.

214.    As a direct and proximate result of the Individual Defendants' conduct, XPO has lost and expended, and will lose and expend, many millions of dollars.

215.    Such expenditures include, but are not limited to, legal fees and payments associated with the Securities Class Action filed against the Company, its CEO, its former CFO, and its former CSO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

216.    Such losses include, but are not limited to, the significant drops in XPO's share price that occurred on December 12, 2018 and on February 15, 2019 as a result of the Company's prior misrepresentations and omissions of material fact, as well as any losses connected to the merger opportunity which was squandered as a result of the December 11, 2018 disclosure.

217.    Such losses also include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

218.    Such losses also include, but are not limited to, approximately $64.5 million that the Company overpaid, at the direction of the Individual Defendants, for its repurchases of its own stock at artificially inflated prices.

219.    As a direct and proximate result of the Individual Defendants' conduct, XPO has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

220.     Plaintiffs bring this action derivatively and for the benefit of XPO to redress injuries

suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary

duties as directors and/or officers of XPO, waste of corporate assets, unjust enrichment, and

violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting

thereof.

221.     XPO is named solely as a nominal party in this action. This is not a collusive action

to confer jurisdiction on this Court that it would not otherwise have.

222.     Plaintiffs are current shareholders of XPO and have continuously held XPO

common stock at all relevant times. Plaintiffs will adequately and fairly represent the interests of

XPO in enforcing and prosecuting its rights, and, to that end, has retained competent counsel,

experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

223.     Plaintiffs incorporate by reference and re-allege each and every allegation stated

above as if fully set forth herein.

224.     A pre-suit demand on the Board of XPO is futile and, therefore, excused. At the

time of filing of this Verified Consolidated Shareholder Derivative Complaint, the Board consists

of the following eight individuals: Defendants Jacobs, Ashe, DeSalva, Jesselson, Kingshott,

Papastavrou, and Shaffer (the "Director-Defendants"), and non-party Marlene M. Colucci together

with the Director-Defendants, the "Directors"). Plaintiffs need only to allege demand futility as to

four of these eight Directors.

225.     Demand is excused as to all of the Director-Defendants because each one of them

faces, individually and collectively, a substantial likelihood of liability as a result of the scheme

they engaged in knowingly or recklessly to make and/or cause the Company to make false and

misleading statements and omissions of material facts, while at the same time, they caused the Company to repurchase its own stock at artificially inflated prices, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

226. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme to make false statements was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

227. Additional reasons that demand on Defendant Jacobs is futile follow. Defendant Jacobs has served as the Company's CEO and Chairman of the Board since September 2011. Defendant Jacobs is also the managing member of JPE and is a controlling shareholder of the Company. Thus, as the Company admits, he is not only a non-independent director, but he has substantial control over the Company (as the 2018 10-K admits). The Company provides Defendant Jacobs with his principal occupation and he receives excessive compensation as described above, including $13,327,471 during the fiscal year ended December 31, 2018. Defendant Jacobs was ultimately responsible for all of the false and misleading statements and omissions that were made, including those personally by him during press releases and conference calls and those contained in the foregoing 10-Ks and 10-Qs, which he signed and signed SOX certifications for. As the Company's highest officer, controlling shareholder, and as a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading

statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Jacobs is a defendant in the Securities Class Action. For these reasons, too, Defendant Jacobs breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

228.     Additional reasons that demand on Defendant Ashe is futile follow. Defendant Ashe has served as a Company director since March 2016. She also serves as a member of the Audit Committee and Acquisition Committee. Defendant Ashe receives handsome compensation as described above. As a Company director and member of the Audit Committee she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Ashe signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K. For these reasons, too, Defendant Ashe breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

229.     Additional reasons that demand on Defendant DeSalva is futile follow. Defendant DeSalva has served as a Company director since September 2017, and as Vice Chairman of the Board since February 7, 2019. She also serves as the Chair of the Nominating and Corporate Governance Committee. As a Company director and Vice Chairman of the Board she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant DeSalva

signed, and thus personally made the false and misleading statements in, the 2017 10-K. For these reasons, too, Defendant DeSalva breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

230.     Additional reasons that demand on Defendant Jesselson is futile follow. Defendant Jesselson has served as a Company director since September 2011. He also serves as a member of the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. Defendant Jesselson receives handsome compensation as described above. As a Company director and member of the Audit Committee, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Jesselson signed, and thus personally made the false and misleading statements in, all of the 10-Ks mentioned herein. For these reasons, too, Defendant Jesselson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

231.     Additional reasons that demand on Defendant Kingshott is futile follow. Defendant Kingshott has served as a Company director since September 2011. He also serves as Chairman of the Compensation Committee and as a member of the Acquisition Committee. Defendant Kingshott receives handsome compensation as described above. As a Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Kingshott signed, and thus personally made the false and misleading statements in, all

of the 10-Ks mentioned herein. For these reasons, too, Defendant Kingshott breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

232.    Additional reasons that demand on Defendant Papastavrou is futile follow. Defendant Papastavrou has served as a Company director since September 2011. He also serves as a member of the Acquisition Committee, Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. Defendant Papastavrou receives handsome compensation, as described above. As a Company director and member of the Audit Committee, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Papastavrou signed, and thus personally made the false and misleading statements in, all of the 10-Ks mentioned herein. For these reasons, too, Defendant Papastavrou breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

233.    Additional reasons that demand on Defendant Shaffer is futile follow. Defendant Shaffer has served as a Company director since September 2011. He also serves as Chairman of the Audit Committee. Defendant Shaffer receives handsome compensation, as described above. As a Company director and Chairman of the Audit Committee, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Shaffer signed, and thus personally made the false and misleading statements in, all of the 10-Ks mentioned herein. For these reasons,

too, Defendant Shaffer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

234.    Additional reasons that demand on the Board is futile follow.

235.    Demand is excused in this case because the Director-Defendants are beholden to and controlled by JPE and thus, Defendant Jacobs, as managing member of JPE, by virtue of JPE's controlling stake over the Company. As the Company admitted in its 2018 10-K, Defendant Jacobs' shareholdings provide him with significant control over the continued employment of the remaining Director-Defendants. In fact, many of the Directors were appointed to the Board in connection with Defendant Jacobs' purchase of control in September 2011.

236.    Defendants Kingshott, Papastavrou, and Shaffer have ties to Defendant Jacobs' former company, URI, and were all appointed as directors when Defendant Jacobs purchased control over XPO in September 2011. For example, Defendant Papastavrou is a current director who serves on URI's Board of Directors and has served in that position since 2005. According to the Spruce Report, Defendant Kingshott was involved at Goldman Sachs MD when it did business with URI, and Defendant Shaffer previously sat on the Board of Directors at "Terex Corp," a company that was charged with aiding and abetting URI for the fraudulent transactions investigated by the SEC. Therefore, these Director-Defendants are unable to consider a demand with the requisite level of disinterestedness.

237.    Defendants Ashe, Jesselson, Papastavrou, and Shaffer (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Audit Committee Charter, the Audit Committee Defendants bear responsibility for, *inter alia*, the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations. The Audit Committee Defendants failed to ensure the

integrity of the Company's internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to engage in improper accounting methods and to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

238.    Additionally, the Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and should have ensured that the Company maintained adequate financial oversight and internal controls over its disclosures and financial reporting to prevent the misconduct discussed herein. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

239.    Additionally, each one of the Director-Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $64.5 million for its own common stock during the period in which the false and misleading statements were made. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company, and yet they approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

240.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In

violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

241.    XPO has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for XPO any part of the damages XPO suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

242.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

243.    The acts complained of herein constitute violations of fiduciary duties owed by XPO officers and directors, and these acts are incapable of ratification.

244.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of XPO. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the

"insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of XPO, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

245. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause XPO to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

246. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM

**Against Individual Defendants for Violations of
Section 14(a) of the Exchange Act**

247. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

248. The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

249.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

250.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

251.    Under the direction and watch of the Director-Defendants, the 2017 and 2018 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*: (1) a significant amount of the Company's growth was due to its business relationship with Amazon, the Company's largest customer; (2) as a result of its dependence on this relationship, the Company was not as well diversified as it purported to be; (3) Amazon had made clear to the Company that the Company's business relationship with Amazon was only going to be temporary; (4) the dissolution of the Company's business relationship with Amazon would have a significantly negative effect on the Company's growth and financial condition; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

252.     The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to strongly correlate pay and performance, in order to "to align the interests of our executive team with the interests of our stockholders" while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

253.     The Proxy Statements also made references to the Code of Conduct. The Code of Conduct required the Company and the Individual Defendants to abide by relevant laws and regulations and make accurate and non-misleading public disclosures. By engaging in issuing false and misleading statements to the investing public, the Individual Defendants violated the Code of Conduct. The Proxy Statements failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

254.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, and advisory approval of executive compensation.

255.     The false and misleading elements of the Proxy Statements led to the re-election of Defendants Jacobs, Ashe, Jesselson, Kingshott, DeJoy, DeSalva, Papastavrou, and Shaffer, which allowed them to continue breaching their fiduciary duties to XPO.

256.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

257.     Plaintiffs on behalf of XPO have no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

258.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

259.     The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding XPO. Not only is XPO now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon XPO by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase $1 billion of its own shares at artificially-inflated prices, damaging XPO.

260.     During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

261.     The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue

and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about XPO not misleading.

262.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by XPO. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

263.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, made and/or signed the Company's Form 10-Ks and 10-Qs filed with the SEC during the Relevant Period.

264.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

265.    Plaintiff on behalf of XPO has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

266.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

267.     The Individual Defendants, by virtue of their positions with XPO and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of XPO within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause XPO to engage in the illegal conduct and practices complained of herein.

268.     Plaintiffs on behalf of XPO has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

269.     Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

270.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of XPO's business and affairs.

271.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

272.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of XPO.

273.     In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

274.    In further breach of their fiduciary duties owed to XPO, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia,* that: (1) a significant amount of the Company's growth was due to its business relationship with Amazon, the Company's largest customer; (2) as a result of its dependence on this relationship, the Company was not as well diversified as it purported to be; (3) Amazon had made clear to the Company that the Company's business relationship with Amazon was only going to be temporary; (4) the dissolution of the Company's business relationship with Amazon would have a significantly negative effect on the Company's growth and financial condition; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

275.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

276.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

277.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

278.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

279.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, XPO has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

280.    Plaintiffs on behalf of XPO have no adequate remedy at law.

**FIFTH CLAIM**

**Against Individual Defendants for Unjust Enrichment**

281.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

282.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, XPO.

283. The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from XPO that was tied to the performance or artificially inflated valuation of XPO, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

284. Plaintiffs, as shareholders and representatives of XPO, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

285. Plaintiffs on behalf of XPO have no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

286. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

287. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

288. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

289. Plaintiffs on behalf of XPO have no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiffs may maintain this action on behalf of XPO, and that Plaintiffs are adequate representatives of the Company;

(b)     Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to XPO;

(c)     Determining and awarding to XPO the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing XPO and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect XPO and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of XPO to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding XPO restitution from the Individual Defendants, and each of them;

      (f)     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: September 27, 2019              Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
       mfarnan@farnanlaw.com

*Liaison Counsel for Plaintiffs*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
*Co-Lead Counsel for Plaintiffs*